IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARLINE M. CURRY, | ) | CASE NO.  1:05CV2094 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE HEMANN |
| | ) | |
| CITY OF MANSFIELD, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | Docket ## 31, 32 |
| Defendants. | ) | |

This case is before the magistrate judge on referral.  Pending is the motion of defendants the City of Manfield ("Mansfield" or "the city"), Lydia Reid ("Reid"), F.L. Fisher ("Fisher"), Angelo Klousiadis ("Klousiadis"), Otto Kulda ("Kulda"), Ed Lemaster ("Lemaster"), Bob Coker ("Coker"), Deb Perry ("Perry"), Joey Hopkins ("Hopkins"), Gary Lester ("Lester"), Ritchie Au ("Au"), Carl Morgan ("Morgan"), Ivan Griffeth ("Griffeth"), Ted Lee ("Lee"), Dale Blamer ("Blamer"), and Eric Sqrow ("Sqrow") (collectively, "the Mansfield defendants") for summary judgment ("Mans. def. mot."; Docket #31).  Also pending is the motion of defendants Michael W. Hout ("Hout"), Jeff Gibson ("Gibson"), Troy Benick ("Benick"), Peter Neumann ("Neumann"), Lewis A. Workman ("Workman"), Tyler Merritt, Jr. ("Merritt"), and Miles H. Jessee ("Jessee") (collectively, "the plant defendants") for summary judgment ("Plant def. mot."; Docket #32).  Plaintiff, Carline Curry ("Curry") has not

an opposition to defendants' motions.[1] For the reasons stated below, the magistrate judge

recommends that the court grant both motions.

## I. Background

The court views the facts, as it must, in the light most favorable to the party opposing

the motion for summary judgment. Plaintiff does not contest or alleges the following facts.

Curry, an African-American female, began working for the Mansfield Waste Water

Treatment Plant ("the plant") in 1981. In 1984 she was promoted to Pretreatment

---

[1] Rather than opposing defendants' motions, Curry sent the court *unfiled* motions to require two attorneys to complete enclosed interrogatories, to order defendants to send the rest of the depositions finished in October, and for a continuation of the deadlines for filing pleadings related to summary judgment. Attached to the motions were two sets of interrogatories for attorneys Shawn Grayson and Brad Miller. The court has filed these motions on behalf of Curry and overruled them.

The court has already told Curry that discovery is closed. Curry's first sets of interrogatories included over 80 interrogatories per party, most with two or three subparts. Not unreasonably, defendants objected. On August 25, 2006 the court gave Curry an extension of time until September 30, 2006 to submit interrogatories in compliance with R. 33(a). Curry failed to serve interrogatories on defendants by the extended deadline. On October 3, 2006 Curry moved for an extension of time until November 30, 2006 to complete interrogatories and moved for permission to serve defendants with more than 50 interrogatories each. On October 3, 2006 the court granted Curry a 10-day extension to serve interrogatories on defendants and otherwise denied her motion. The court also warned Curry that there would be no further extensions of time for serving interrogatories. Curry again failed to serve interrogatories on defendants by the allowed date.

Discovery ended October 31, 2006. Defendants filed motions for summary judgment on November 30, 2006 and December 4, 2006. On December 8, 2006, well after the close of discovery and after the filing of dispositive motions, Curry filed a motion to compel the city to answer interrogatories and moved for permission to serve defendants with more than 25 interrogatories each. The court denied this request as out of time and not in compliance with the court's order of October 3, 2006.

On January 11, 2007, Curry again asked for an extension of time to prepare interrogatories and for the court to compel defendants to answer those interrogatories. The court overruled this motion and told Curry that discovery ended two and a half months ago and would not be reopened. The court then gave Curry an additional two weeks to obtain a copy of her deposition and extended the deadline for her opposition brief until March 2, 2007. Curry failed to file an opposition brief by that deadline.

Coordinator.

Curry regularly supervised two employees, Benick and Gibson.  Between 1998 and 2003 she had four informal disciplinary conferences with Gibson.  These conferences addressed such matters as failing to sign forms, failing to clean countertops, and failing to ice wastewater samples.  Between September 15, 2003 and October 17, 2003, she had two informal disciplinary conferences with Gibson and two with Benick.

In the late fall of 2003 Klousiadis, then plant manager, received reports that Curry had threatened other employees.  One report alleged that Curry had told an employee named Jessee, "I'm going to go home and get a gun and blow your fucking head off."  The city requested that the city police department investigate the matter.  After an initial investigation determined that a more thorough investigation was warranted, the plant placed Curry on administrative leave with pay.  When the plant placed Curry on leave, they directed her to make the car provided by the city for her use available for a police search.  The police searched the car and, with her consent, her duffel bag.  They found no weapons.  A more thorough investigation of the complaints against Curry determined that there was insufficient evidence to warrant criminal charges.  An administrative hearing in January 2004 over the matter concluded that the evidence did not support the allegation that Curry had threatened Jessee.

Curry returned from administrative leave on January 12, 2004.  Upon her return the director of public works, the human resources director, and Klousiadis met with all supervisors at the plant and directed them to treat each other professionally and to cooperate in resolving problems.  They warned supervisors that failure to comply with this directive would result in disciplinary measures.

3

Curry's relationship with Gibson and Benick deteriorated after her return from leave. Curry alleges that their work was unsatisfactory and that she was unable to discipline them properly.  Curry also alleges that when she complained regarding employees' performance, she was told that her standards were too high, that she was difficult to work with, and that she was "nit-picking."  On May 6, 2004 Curry went to work on her day off to confront Gibson and Benick regarding statements they made to the police during their investigation of the allegation, to wit, that Curry had threatened other workers.  As a result of this confrontation, Curry was suspended for one day without pay.

On July 22, 2004 Klousiades issued two directives in an attempt to resolve problems between Curry and her subordinates.  One directive prohibited employees from tape recording any conversations taking place at the plant.  The other directive required that Curry issue daily assignments to her staff in writing; that sampling aides begin work at 7:30 a.m.; that sampling aides clean equipment and complete paperwork in designated areas; that Curry consult with Kulda, the operations supervisor, and reach agreement with him before initiating discipline against her subordinates; that Curry address problems in communicating with subordinates with Klousiadis; and that all employees conduct themselves in a professional manner.  Klousiadis also directed Curry to perform her work in her private office, located near the offices of Klousiadis and Kulda and near the Pretreatment Room.  Curry was suspended for one day for failing to comply with the latter directive.  Curry alleges that Kulda, in violation of the union contract, did not follow proper procedures for handling disciplinary actions.

Following the implementation of these measures, Benick and Gibson received more severe disciplinary sanctions jointly agreed upon by Curry and Kulda.  Benick faced

4

repeated disciplinary charges for misconduct and served a 34-day suspension without pay. He eventually transferred out of the plant.  Gibson also received discipline and served a one-day suspension without pay.  He has not received disciplinary sanctions since that suspension.  Curry claims that Benick and Gibson altered records to eliminate charges that they were insubordinate.

Curry alleges that Jessee wrote that it did not matter that Curry was at the plant, that she was "just a woman," and that he would "knock the black off her."  Curry does not specify when or to whom Jessee made these statements and does not provide evidence to support the allegations.

Curry alleges that her car was repeatedly vandalized and searched and a garter snake placed under her door by defendants in this case.  She also contends that when someone entered her office and left a heart-shaped candy bearing the notation "I'm me" on her desk and she complained to Kulda, Kulda responded, "The mouse did it."  Curry also alleges that Benick stalked or followed her in Ontario, Ohio.  Curry states that no defendant did anything to stop this harassment.  Further, Curry claims that defendants repeatedly defamed her by asserting that she had screamed at them, cursed them, threatened them, went into the men's bathroom to confront certain defendants, and otherwise harassed defendants on the basis of race and gender.  Curry does not specify which defendants made these assertions, and Curry offers no evidence to support any of the preceding allegations.

Curry alleges that defendants Reid, Smith, Fisher, Kloudiadis, and Smith discriminated against her by giving her smaller raises in percentage terms from 1990 to 2005 than they gave to Lemaster, Coker, and Kulda.  Curry also claims that the plant

administration does not properly discipline workers for poor performance and insubordination, except that she is disciplined even for things that she did not do.  Curry provides no evidence to support these allegations.

Curry alleges that she has suffered embarrassment, humiliation, emotional fatigue, and stress because of the falsehoods spread about her, because administrators refused to allow her to discipline employees who did not do their jobs properly, and because administrators failed to stop defendants from harassing her.  Curry contends that defendants treated her as they did because of her race and gender.

On August 8, 2005 Curry filed in this court a complaint against defendants, alleging violations of 42 U.S.C. § 2000 *et seq.* ("Title VII") and Ohio Rev. Code Ch. 4112 ("Ch. 4112") due to racial and gender harassment and discrimination, violations of 42 U.S.C. 1981 ("§ 1981"), intentional infliction of emotional distress, defamation, and negligent supervision.  Defendants deny Curry's allegations and move for summary judgment.

## II.  Standard for summary judgment

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U. S. 317 (1986).  The substantive law of the case identifies which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact.  *Id.* at 323.  The nonmoving party must then show the existence of a material fact which must be tried.  *Id.* at 324.

When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party

6

opposing the motion . . . ."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962);  *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962);  *Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 369 F.2d 648 (6th Cir. 1966).  This includes taking the nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to the nonmoving party's assertions when they conflict with those of the movant.  *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e).  *See Celotex,* 477 U.S. at 324.  The nonmoving party may oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ,"  *id.*, or by any other evidentiary material admissible at trial.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, 10A, § 2721 (1998).  There must be enough evidence that a reasonable jury could find for the nonmoving party.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989).

### III.  Alleged racial and gender discrimination

Curry alleges that she is subjected to harassment on the job and discriminatory treatment because of her race and gender.  Defendants deny that race or gender motivated the treatment of Curry, that Curry has suffered an adverse employment action, or that she was treated differently than similarly-situated white male employees.

Title VII prohibits employers from discriminating against employees on the basis of certain protected classifications:

7

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

This language "is not limited to 'economic' or 'tangible' discrimination.  The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . . in employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). The elements and burden of proof for a plaintiff alleging discrimination are the same regardless of the type of discrimination alleged by plaintiff.  *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

Chapter 4112.02(A) also prohibits employers from discriminating against employees on the basis of race and gender:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

A victim of such conduct has a private right of action under  Ohio Rev. Code § 4112.99. *See Frantz v. Beechmont Pet Hosp.*, 117 Ohio App. 3d 351, 356, 690 N.E.2d 897, 900 (1996).  The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112."  *Plumbers & Steamfitters Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128,

8

131 (1981).  *See also In re Brantley*, 34 Ohio App. 3d 320, 518 N.E.2d 602 (1987).  The court, therefore, will apply the same analysis to plaintiff's claims under Title VII and Ch. 4112.  *See also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (holding that claims brought under Title VII and Ohio state law are examined using the same legal framework).

A.    *Hostile work environment*

A plaintiff alleging discrimination in violation of Title VII due to the creation of a hostile work environment may establish a *prima facie* case by showing:  (1) plaintiff belongs to a protected class; (2) plaintiff was subject to unwelcome harassment; (3) the harassment was based on plaintiff's membership in a protected class; (4) the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment; and (5) defendant knew or should have known of the harassment and failed to implement prompt and appropriate corrective action.  *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998) (quoting *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir. 1997); *see also Harris*, 510 U.S. at 21 (holding that a workplace environment is sufficiently hostile to ground a suit for sexual harassment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ").  Adversely affecting a plaintiff's psychological well-being affects a term or condition of employment.  *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir.1987).  The standard includes both objective and subjective components.  "The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive,

9

and the victim must subjectively regard that environment as abusive."  *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997) (citing *Harris*, 510 U.S. at 21).

Analysis of whether the alleged harassment is objectively "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment'" includes consideration of a variety of factors, including

> the frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23; *see also Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998)

"This is not, and by its nature cannot be, a mathematically precise test."  *Harris*, 510 U.S. at 22.  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  *Id.* at 23; *see also Abeita*, 159 F.3d at 251.  In alleging a sexually hostile environment, for example, a plaintiff must cite more than simply a single or isolated incident.  *Rabidue v. Osceola Ref. Co.*, 805 F.2d 611, 620 (6th Cir. 1986), *superceded on other grounds*, *Harris*, 510 U.S. at 21.  Moreover,

> [w]e have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations.  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." . . . Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* . . . because of . . . sex."
>
> And there is another requirement that prevents Title VII from expanding into a general civility code: As we emphasized in *Meritor* and *Harris,* the statute does not reach genuine but innocuous differences in the ways men and women routinely

10

interact with members of the same sex and of the opposite sex.   The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting *Harris,* 510 U.S. at 21).  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Nevertheless, "Title VII comes into play before the harassing conduct leads to a nervous breakdown. . . . So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious."  *Harris*, 510 U.S. at 22.  The determination as to whether an environment is "hostile" or "abusive" is necessarily fact-specific.

In the instant case the court need not decide whether the treatment accorded Curry was sufficiently severe to create a hostile work environment because Curry has done nothing to show that she was treated differently because of her race or gender.  The only incident alleged by Curry that suggests any racial or gender animus is Curry's allegation that Jessee wrote to some unnamed person that Curry was "just a woman" and that he would "knock the black off her."  Even if Curry provided evidence to support this allegation, and she does not, it would be insufficient to show that the treatment accorded her by administrators and other employees generally was motivated by her race or gender.[2]

---

[2]  Moreover, many of the defendants are not "employers" within the meaning of Title VII.  Rather, they are Curry's co-workers.  Consequently, they cannot be liable to Curry

Because Curry fails to show that race or gender motivated the treatment of her on the job, she is unable to establish a *prima facie* case of race or gender discrimination due to a hostile work environment.  For these reasons the magistrate judge recommends that the court grant defendants' motions as they relate to Curry's claims of a hostile work environment because of her race or gender.

B.    *Disparate treatment*

Curry also alleges that she was treated unfavorably because of her race and gender. A plaintiff who alleges disparate treatment under Title VII must satisfy the minimal requirements to establish a *prima facie* case as described in *McDonnell Douglas Corp. v. Green*, 441 U.S. 792 (1973), and *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992): "[T]he plaintiff must produce evidence which at a minimum establishes (1) that [she] was a member of a protected class and (2) that for the same or similar conduct [she] was treated differently than similarly-situated non-minority employees."  *Mitchell*, 964 F.2d at 583.  "Similarly-situated" employees must be

> similarly-situated in all respects.  Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* (citations omitted).   "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)  (quoting  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

---

pursuant to Title VII or Ch. 4112.

Curry alleges that defendants Reid, Smith, Fisher, Kloudiadis, and Smith discriminated against her by giving her smaller raises in percentage terms from 1990 to 2005 than they gave to Lemaster, Coker, and Kulda.  Curry also alleges that the plant administration does not properly discipline workers for poor performance and insubordination, except that she is disciplined even for things that she did not do.  Curry provides no evidence to support these allegations, does not demonstrate that any individual to whom she compares herself was a similarly-situated employee within the meaning of Title VII, and does not show that the conduct of the employees to whom she compares herself was the same or similar to her own conduct.  Curry fails, therefore, to establish a *prima facie* case of disparate treatment.  For this reason the magistrate judge recommends that the court grant defendants' motions as they relate to Curry's claims of a disparate treatment because of her race or gender.

### IV.  Intentional infliction of emotional distress

Curry alleges that defendants intentionally inflicted emotional distress on her, thus making defendants liable to her in tort under Ohio law.[3]  Defendants respond that Curry provides no evidence to support a *prima facie* case of intentional infliction of emotional distress and has testified that she has had no health problems since 1999 and that she has not seen a psychiatrist in connection with the alleged emotional distress.

A defendant is liable for intentional infliction of emotional distress if it is proved that (1) the defendant intended to cause the plaintiff serious emotional distress, (2) the defendant's conduct was extreme and outrageous, and (3) the defendant's conduct was

---

[3]  Curry does not distinguish between the village and the other defendants in her allegations.

13

the proximate cause of plaintiff's serious emotional distress.  *Phung v. Waste Mgmt., Inc.*, 71 Ohio St. 3d 408, 410, 644 N.E.2d 286, 289 (1994).  Defendant's conduct must be "so extreme and outrageous as to go 'beyond all possible bounds of decency'" and "be considered as 'utterly intolerable in a civilized community . . . ."  *Carlton v. Davisson*, 104 Ohio App.3d 636, 653, 662 N.E.2d 1112, 1123 (1995).  The distress experienced by plaintiff must be serious and of a nature that no reasonable person could be expected to endure it.  *Id.*  An allegation of intentional infliction of emotional distress necessarily alleges, therefore, a wilful and intentional design to do injury through conduct which is unjustified.  Thus, the individual defendants do not have immunity from an allegation of intentional infliction of emotional distress.

The only alleged incidents which Curry describes with sufficient specificity conduct that might in any way be said to approach extreme and outrageous behavior were the allegations that someone repeatedly vandalized and searched her car and placed a garter snake under her door.  Curry does not identify which individuals did these things, nor does she provide any evidence that these events, indeed, occurred.  Thus, Curry fails to provide sufficient evidence to allow a reasonable jury to find any defendant liable to her for intentional infliction of emotional distress.   For this reason, the magistrate judge recommends that the court grant defendants' motions for summary judgment as it regards Curry's claim for intentional infliction of emotional distress.

## V.  Defamation

Curry alleges that defendants defamed her by asserting that she had screamed at them, cursed them, threatened them, gone into the men's bathroom to confront certain defendants, and otherwise harassed defendants on the basis of race and gender.

14

Defendants respond that Curry has failed to identify who made the allegedly defamatory statements and assert that the statements were protected by privilege.

Under Ohio law a plaintiff alleging defamation, whether by libel or slander, must demonstrate that a defendant published defamatory and actionable statements to a third person who understood the defamatory nature of the publication.  *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.*, 81 Ohio App. 3d 728, 736, 612 N.E.2d 357, 362 (1992). A plaintiff establishes a *prima facie* case of defamation by showing that a defendant was responsible for the following:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv.'s, Inc.*, 81 Ohio App. 3d 591, 601, 611 N.E.2d 955, 961 (1992) (quoting 3 Restatement of the Law 2d, Torts, § 558, p. 155 (1977)).

Curry fails to allege that any particular defendant made a defamatory statement. She fails to establish, therefore, a *prima facie* case of defamation against any defendant.[4] For this reason the magistrate judge recommends that the court grant defendants' motions with respect to Curry's cause of action for defamation.

---

[4]  Defendants also contend that the allegedly defamatory statements were made in the course of their employment for the purpose of improving their respective jobs.  As such, defendants argue, the statements are privileged, citing *Evely v. Carlon*, 4 Ohio St. 3d 163, 447 N.E.2d 1290 (1983).  Curry makes no response to this argument.

15

VI.  Violations of § 1981

Curry alleges that defendants hindered her ability to enforce her interest under the

collective bargaining agreement between Local 3088 and Mansfield because of her race.[5]

Title 42 U.S.C. § 1981 provides:

> **(a)  Statement of equal rights.**  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
> **(b)  "Make and enforce contracts" defined.** For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
> **(c)  Protection against impairment.**  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

The protections afforded by § 1981 include a cause of action for intentional racial

discrimination which interferes with the right to make and enforce contracts in the context

of employment.  *General Bldg.Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389-91

(1982).

"Racial discrimination" is understood broadly in the context of §1981.  In passing §

1981, "Congress intended to protect from discrimination identifiable classes of persons who

are subjected to intentional discrimination solely because of their ancestry or ethnic

characteristics."   *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

Specifically, if a plaintiff "can prove that he was subjected to intentional discrimination

---

[5]  Curry also alleges that defendants hindered her ability to enforce her interest under the collective bargaining agreement because of her gender.  Gender discrimination in the making and enforcing of contracts is not cognizable under § 1981.

based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981."  *Id.*

An individual is liable under § 1981 for intentionally interfering with another's right to make and enforce contracts on account of race.  "[M]erely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation." *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1145 (4th Cir. 1975) (quoting *Lobato v. Pay Less Drug Stores,* 261 F.2d 406, 408 (10th Cir. 1958)).  "Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability . . . ."  *Tillman*, 517 F.2d at 1145 (quoting *Lobato*, 261 F.2d at 408).

A municipality may not be held liable for its employees' violations of § 1981 under a theory of *respondeat superior*.  "[T]he express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).  To prevail in an action against a municipality, a "petitioner must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* [*v. Dep't of Social Servs.*, 436 U.S. 658 (1978)] and subsequent cases."  *Id.* at 735-36.

The principles developed in *McDonnell Douglas* for establishing a *prima facie* case of employment discrimination under Title VII also apply to actions brought pursuant to § 1981.  *Patterson v. McLean*, 491 U.S. 164, 186 (1989); *Jackson v. RKO Bottlers,* 743 F.2d

370, 378 (6th Cir. 1984).  To establish a *prima facie* case a plaintiff must provide evidence that an employer treated plaintiff less favorably than others on account of race and that the employer had a discriminatory intent in according plaintiff less favorable treatment.  *See Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977 (1988).

As has already been shown, Curry has failed to offer evidence that she was treated less favorably than other, non-minority employees.  Curry also fails to offer any evidence that her employer intended to discriminate on account of race in its treatment of Curry or that the city had a custom or policy of interfering with contracts because of race.  For these reasons the magistrate judge recommends that the court grant defendants' motions as regards Curry's cause of action for discrimination pursuant to § 1981.

## VII.  Negligent supervision

Curry contends that Mansfield and her supervisors are liable to her for negligently supervising her co-workers.  Defendants respond that Curry is unable to establish a *prima facie* case of negligent supervision against any defendant.

Ohio's tort of negligent supervision requires a plaintiff to provide evidentiary support for six separate elements of the tort:

> To prevail on a claim for negligent supervision and retention, a plaintiff must show the following:  "(1) the existence of an employment relationship;  (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in * * * retaining the employee as the proximate cause of plaintiff's injury." [FN20]   A plaintiff must also show that the employee's act was reasonably foreseeable.[FN21]  An act is reasonably foreseeable if the employer knew or should have known of the employee's "propensity to engage in similar criminal, tortious, or dangerous conduct." [FN22]

FN20.  *Steppe v. Kmart Stores* (1999), 136 Ohio App.3d 454, 465, 737 N.E.2d 58.

18

FN21. *Wagoner v. United Dairy Farmers, Inc.* (Nov. 17, 2000), 1st Dist. No. C-990767, 2000 WL 1714252.

FN22. Id.

{¶ 28} In essence, this tort requires the plaintiff to suffer an injury at the hands of an employee, after an employer has discovered the employee's incompetence and continued to maintain his employment.

*Doe v. Archdiocese of Cincinnati*, 167 Ohio App. 3d 488, 497, 855 N.E.2d 894, 901 (2006).

Curry fails to show that any co-worker was incompetent, that Mansfield or any supervisor knew or should have known of such incompetence, that she was injured as a result of a co-worker's act, that her employer's negligent supervision of the co-worker was a proximate cause of an injury to her, or that any such injury was foreseeable.  Curry having failed to offer evidence to support any element of negligent supervision, the magistrate judge recommends that the court grant defendants' motions for summary judgment as they relate to her cause of action for negligent supervision.

VIII.  Conclusion

For the reasons given above,  the magistrate judge recommends that the court grant defendants' motions for summary judgment in their entirety.

Dated:  March 8, 2007                    s:\Patricia A. Hemann
                                         Patricia A. Hemann
                                         United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).